[Cite as *State v. Middleton*, 2021-Ohio-3498.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                  :

    Plaintiff-Appellee,                   :

                                     No. 20AP-196
v.                                             :       (C.P.C. No. 18CR-5966)

Damar D. Middleton,                            :       (REGULAR CALENDAR)

    Defendant-Appellant.                 :

D E C I S I O N

Rendered on September 30, 2021

**On brief:** [*G. Gary Tyack*], Prosecuting Attorney, and *Barbara A. Farnbacher*, for appellee.

**On brief:** *Wolfe Law Group, LLC*, and *Stephen T. Wolfe*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, P.J.

{¶ 1} Defendant-appellant, Damar D. Middleton, appeals a March 5, 2020[1] entry of the Franklin County Court of Common Pleas retaining jurisdiction over him pursuant to R.C. 2945.39 and 5122.01(B)(1), (3), and (4). For the reasons that follow, we affirm.

## I. Facts and Procedural History

{¶ 2} On December 6, 2018, appellant was indicted by a Franklin County Grand Jury and charged with eight felony offenses related to two separate incidents that occurred on May 13 and 17, 2017.

{¶ 3} According to the indictment, appellant was charged with aggravated robbery, pursuant to R.C. 2911.01, a felony in the first degree; robbery, pursuant to R.C. 2911.02, a felony in the second degree; and robbery, pursuant to R.C. 2911.02, a felony in the third degree; related to an incident that occurred on May 13, 2017 with the prosecuting witness named as Jhad Adi.

{¶ 4} According to the indictment, appellant was also charged with aggravated burglary, pursuant to R.C. 2911.11, a felony in the first degree; aggravated robbery, pursuant to R.C. 2911.01, a felony in the first degree; robbery, pursuant to R.C. 2911.02, a felony in the second degree; robbery, pursuant to R.C. 2911.02, a felony in the third degree; and

---

[1] Subsequent to the March 5, 2020 entry, on March 10, 2020, the trial court filed another entry wherein the court reiterated its findings that: (1) appellant remained incompetent and there is not a substantial probability that he will become competent if provided with further treatment, (2) clear and convincing evidence established appellant committed the offenses with which he was charged, (3) clear and convincing evidence established appellant is mentally ill subject to court order, and (4) the court had announced its decision on the issue of continuing jurisdiction in the March 5, 2020 entry. Accordingly, the court ordered appellant be committed, pursuant to R.C. 2945.39(D)(1), to the Columbus Developmental Center ("CDC"), which the court found to be the least restrictive commitment available consistent with public safety and appellant's welfare. We construe the March 10, 2020 order to be the final appealable order, thereby making the March 5, 2020 order appealable. We follow the precedent in *State v. Williams*, 126 Ohio St.3d 65, 2010-Ohio-2453, *State v. Decker*, 10th Dist. No. 16AP-684, 2020-Ohio-1464, and *State v. Ellison*, 10th Dist. No. 17AP-328, 2018-Ohio-1835, as examples of cases where this court or the Supreme Court of Ohio have accepted for review trial court determinations to retain jurisdiction of a case finding a defendant not competent, not restorable, and mentally ill subject to court order pursuant to R.C. 2945.39(A). Furthermore, notwithstanding R.C. 2945.39(A) orders differ from R.C. 2945.38 orders, we find to be instructive *State v. Muncie,* 91 Ohio St.3d 440, 446, 451 (2001), finding an order pursuant to R.C. 2945.38 to force medication for restoration to be a final appealable order pursuant to R.C. 2505.02(B)(4) as a "provisional remedy," and *State v. Upshaw,* 110 Ohio St.3d 189, 2006-Ohio-4253, ¶ 19, finding an order pursuant to R.C. 2945.38 to commit to an institution for restoration to be a final appealable order pursuant to R.C. 2505.02(B)(4) as a provisional remedy. Finally, we acknowledge this court's holding in *State v. Janney*, 55 Ohio App.2d 257 (10th Dist.1977), that a finding of not guilty by reason of insanity pursuant to what appears to be a prior version of R.C. 2945.39 is not a final judgment or order appealable to a court of appeals. We distinguish this case on two grounds: first, the case before us involves a finding of incompetency not insanity, and second, the case was decided prior to when R.C. 2505.02 was amended to include division (B)(4) regarding an order that grants or denies a provisional remedy.

kidnapping, pursuant to R.C. 2905.01, a felony in the first degree; related to an incident that occurred on May 17, 2017 with the prosecuting witness named as Jonathan Small. The indictment included a three-year firearm specification associated with the charges related to the May 17, 2017 offenses.

{¶ 5} On January 19, 2019, appellant filed a motion for a competency evaluation pursuant to R.C. 2945.37. The trial court granted the motion under R.C. 2945.371 pursuant to an entry filed January 23, 2019. Dr. Danielle Martines with Netcare Forensic Center evaluated appellant and, according to her report dated April 18, 2019, found appellant has an intellectual disability within the moderate range and further that he has a mental illness. Dr. Martines found that as a result of appellant's intellectual disability, he was presently incapable of understanding the nature and objective of the proceedings against him or assisting in his defense. Counsel for plaintiff-appellee, State of Ohio, and appellant, respectively, stipulated to Dr. Martines' report on April 29, 2019 pursuant to R.C. 2945.37(E).

{¶ 6} Thereafter, on May 1, 2019, pursuant to R.C. 2945.371(H), the trial court ordered appellant undergo a separate intellectual disability evaluation to be conducted by the director of developmental disabilities based on the findings in Dr. Martines' report. Dr. Kristin Rasmussen, supervising psychologist at the Columbus Developmental Center ("CDC"), evaluated appellant and prepared a report dated May 30, 2019.

{¶ 7} On June 17, 2019, a hearing was held before the trial court concerning the information contained in Dr. Rasmussen's report.[2] At that time, counsel for the state and appellant stipulated to the contents of Dr. Rasmussen's report pursuant to R.C. 2945.37(E). Based on the evidence presented at the hearing and the parties' stipulations, the court found that at the time of the hearing, appellant was mentally ill, had an intellectual disability, level not identifiable other than being borderline to mild range, did not understand the nature or objective of the proceedings against him, and was unable to assist in his defense at the time. Further, the trial court noted it was not able at that time to determine whether there

---

[2] A transcript of this proceeding was not included in the record sent to this court on appeal. Therefore, we gather the information regarding this hearing from the trial court's entry filed June 18, 2019. Furthermore, there is no dispute as to the proceedings that took place, nor are the issues determined at that juncture of the case pertinent to the issues on appeal in the instant matter.

was a substantial probability that appellant would become competent to stand trial within one year if he is provided a course of treatment. The trial court ordered continuing evaluation and treatment, not to exceed four months, and on consideration of appellant's level of dangerousness to himself and others, the need for security and the type of crimes involved, further ordered appellant to be placed at a facility operated by the Ohio Department of Developmental Disabilities ("ODDD").

{¶ 8} Dr. Rasmussen filed a second report, dated October 30, 2019, detailing her evaluation of appellant conducted on October 29, 2019.[3] In her report, Dr. Rasmussen provided that, in her opinion, there was not a substantial probability that appellant could be restored to competency if provided with further treatment. Dr. Rasmussen also opined appellant continues to be mentally ill, however he is not a person with an intellectual disability as defined in R.C. 5123.01(O). Counsel for the state and appellant stipulated to Dr. Rasmussen's finding that despite a course of treatment, appellant remained incompetent and there is not a substantial probability he will become competent if provided with further treatment.

{¶ 9} The trial court held evidentiary hearings on January 14 and 21, 2020 on the state's request for an order declaring appellant subject to the continuing jurisdiction of the court for purposes of commitment for mental health treatment on grounds there was clear and convincing evidence that appellant committed the crimes with which he was charged and is a mentally ill person subject to court order pursuant to R.C. 2945.39(A)(2)(a) and (b). *See* R.C. 2945.39(D). Although appellant did not contest he was not competent to stand trial, he did not agree the trial court could retain jurisdiction over him.

{¶ 10} The trial court heard testimony from two co-defendants, one victim, and one detective regarding the criminal offenses that occurred on May 13 and 17, 2017 for which appellant was indicted. Below we summarize the facts of the May 13, 2017 incident first, then the facts of the May 17, 2017 incident.

{¶ 11} Regarding the May 13, 2017 incident, Brooke Murphy testified she used the app "OfferUp" in May 2017 to sell her iPhone she no longer wanted. According to Murphy's testimony, she did not personally arrange the sale, but her then-boyfriend, Anthony James,

---

[3] According to the trial court's March 10, 2020 entry, counsel for the state and appellant stipulated to Dr. Rasmussen's finding that despite a course of treatment, appellant remained incompetent and there is not a substantial probability that appellant will become competent if provided with further treatment.

told Murphy she was to meet with someone who wanted to buy her phone and afterward she would receive "a free $100." (Tr. at 36.) Murphy, James, and appellant, who according to Murphy was also a friend of hers and James at the time, drove to an apartment complex in North Columbus, Franklin County, Ohio to meet Adi who was to buy Murphy's iPhone. Murphy dropped James and appellant off at the front of Adi's apartment complex at James' request, while Murphy drove to the back of the apartment complex to meet Adi. Murphy testified Adi got into her car and the two had a conversation until Murphy saw James and appellant walk up to her car. Murphy testified either James or appellant opened her passenger side car door, and Adi attempted to run; however, James and appellant caught up with Adi. Murphy explained she did not know what happened thereafter but she "knew something bad was going to happen." (Tr. at 42.) Murphy testified she felt her car move and therefore believed a physical altercation ensued. Once James and appellant returned to Murphy's car, they had an iPhone and a wallet they did not have prior to meeting Adi. According to Murphy, the purpose of the advertisement on OfferUp was to take Adi's money.

{¶ 12} Detective Kenneth Kirby with the Columbus Police Department Robbery Unit also testified. Through the course of his investigation of the May 13, 2017 incident, Detective Kirby met Adi a few days after the robbery and Adi provided photographs reflecting injuries he sustained in the incident and details of the robbery. Detective Kirby testified Adi informed him he arranged to meet Murphy through OfferUp to purchase a cell phone. Adi explained he met with Murphy in her car in the parking lot of his apartment complex and asked to look at her phone. At the same time, the passenger side door of Murphy's car opened and Adi was dragged from the car and assaulted. Adi told Detective Kirby he was at one point able to run across the parking lot away from the men, however, he was tackled and again assaulted and his property was taken from his pockets. According to what Adi reported to Detective Kirby, Adi briefly lost consciousness while on the ground of the parking lot.

{¶ 13} At the time of the meeting, Detective Kirby observed marks and abrasions on Adi from the incident. Adi provided Murphy's cell phone number and a picture of Murphy from Facebook to Detective Kirby. The information provided by Adi would later identify

Murphy. Adi identified Murphy as an individual involved in the incident; however, he did not identify appellant in a photo array.

{¶ 14} Regarding the May 17, 2017 incident, Small testified he met a woman named Alexandria James, who was later identified as Murphy, on the dating app "Plenty of Fish" in May 2017, and ultimately invited her to his apartment located in Grove City, Ohio. Small testified that 15 minutes after Murphy arrived, someone knocked at his apartment door. Murphy told Small the person knocking was her brother; however, according to Small, once they opened the door, five or six black males rushed into his apartment. Small recalled once the group entered his apartment, he was punched in the head and struck a few times with a golf club. He was then held down by one of the men in front of his washer and dryer; unable to move. While being held down, Small testified he was struck a few times and repeatedly hit with a golf club by one of the individuals. Small testified the group brought the golf club to his apartment because he does not own golf clubs and did not recognize the golf club with which he was hit. He testified the golf club broke in half during the beating. A picture of the broken club was identified and admitted into evidence.

{¶ 15} Small explained that while he was held by one of the individuals he turned his head away to avoid being struck in the face and was not able to observe all that occurred in his apartment. Small testified he was threatened he would be killed if he looked at anyone, indicating they had a gun, however Small testified he never saw a gun.

{¶ 16} Small testified he believes the group came to his apartment to rob him and that the following items were taken by the group during their time in his apartment: a T.V., approximately five jerseys, a couple bracelets and necklaces, a gold watch, and at least $500 in cash. The cash stolen from Small was in his wallet, which was removed from his pants pocket at the time of the robbery, and the remaining stolen items were from his bedroom. Small testified he did not give the individuals permission to enter his apartment or remove his personal belongings, including his wallet.

{¶ 17} According to Small, Murphy left once the door opened and the first person entered his apartment. Small believes the group was in his apartment for about three minutes and then left. The last man to leave was the one holding Small and Small testified the person threatened to kill him if he followed them out the door. Small testified he chased the group and observed them split into two vehicles; the first vehicle was a "little, like, Ford

Escort," and the second a black or blue Ford SUV or Expedition. (Tr. at 21.) Small called police and read the license plate of the second vehicle to law enforcement before he fell to the ground.

{¶ 18} Small testified he suffered physical injuries as a result of the robbery in his apartment; including bruises on his back, almost a black eye, a large lump on the back of his head, bruising, and a cut to his hand. In addition to the physical injuries suffered, Small testified that since the robbery he suffers from paranoia and fear.

{¶ 19} Murphy testified she met Small on Plenty of Fish in May 2017. Murphy testified she visited Small's apartment, and that she drove James and appellant in a Ford Focus, with two other males; Bryce Tanksley and Malcolm Taylor, who drove separately in Tanksley's vehicle to Small's apartment. Murphy testified she was told by the group to go into Small's apartment and wait until there was a knock at the door. Murphy testified appellant, Tanksley, and Taylor entered Small's apartment, but she did not see James enter the apartment. The next time Murphy saw the group she testified they were running out of the apartment and Taylor was carrying a T.V.

{¶ 20} Tanksley testified that in May 2017 he was friends with Murphy, James, appellant, and Taylor. Tanksley further testified that he spoke with James and as a result of the conversation, as directed by James, he drove his Ford Explorer with Taylor to an apartment complex located in Grove City to what Tanksley believed was to be a fight that turned into a robbery. According to Tanksley, he and Taylor met appellant and James in the parking lot of the apartment complex and Murphy was not present. Tanksley testified appellant and James had a golf club with them. According to Tanksley, the group walked to an apartment and James knocked on the door. Murphy answered the apartment door and fled.

{¶ 21} Tanksley testified the group entered the apartment and fought with Small, including striking Small with a golf club. Tanksley explained appellant and James stood in front of Small during the incident holding him to the wall while fighting with him. According to Tanksley, Taylor threatened to shoot Small if he moved, however, Tanksley confirmed no one had a gun. Tanksley provided testimony similar to Small's in that the group went through the apartment taking the same items testified to by Small, including James reaching into Small's pocket to remove Small's wallet and appellant taking Small's

jerseys. Tanksley testified he stole a keychain and received $20 from James. Tanksley testified the group was in Small's apartment for no more than two to three minutes. Tanksley also testified Taylor took Small's T.V. and put it in the Explorer.

{¶ 22} Detective Kirby also investigated the May 17, 2017 incident, describing it as a home invasion, to which Murphy was also linked. Detective Kirby stated the May 17, 2017 incident had circumstances similar to the May 13, 2017 incident in that Murphy was the account holder of the app that arranged her meeting with Small, and the suspects involved in the incident were linked to Murphy as her acquaintances. Just as Adi did, Small provided Murphy's cell phone number and a Facebook photograph of Murphy to Detective Kirby. Detective Kirby was able to identify Tanksley as an individual involved in the incident from the license plate information provided by Small. Small identified Murphy and Tanksley as involved in the incident, but did not identify appellant in a photo array.

{¶ 23} Based on the evidence and testimony presented at trial, the trial court found clear and convincing evidence to establish appellant committed the offenses. *See* R.C. 2945.39(A)(2)(a).

{¶ 24} Dr. Rasmussen also appeared before the trial court and testified to her reports concerning her evaluations of appellant and her resulting opinions, the specifics of which are detailed in our discussion of the assignment of error below.

{¶ 25} Based on the testimony and evidence presented at trial, the trial court found by clear and convincing evidence appellant to be mentally ill as defined by R.C. 5122.01(A) and mentally ill subject to court order pursuant to R.C. 5122.01(B)(1), (3), and (4). *See* R.C. 2945.39(A)(2)(b).

{¶ 26} In accord with its findings contained in its entry filed March 5, 2020, the trial court granted the state's request to retain jurisdiction over appellant and, in weighing the needs of public safety and the welfare of appellant, ordered appellant to be placed at CDC. It is from the trial court's findings and order appellant filed this appeal.

## II. Assignment of Error

{¶ 27} Appellant assigns the following sole assignment of error for our review:

> The trial court erred when it found that it retained jurisdiction over Appellant.

## III. Analysis

### A. Applicable Law

{¶ 28} "Under R.C. 2945.38(B)(1) and (C)(1), a common pleas court presiding over a criminal case involving a defendant charged with a violent first- or second-degree felony who has been found incompetent to stand trial pursuant to R.C. 2945.37 may require the defendant to undergo treatment for up to one year." *State v. Williams*, 126 Ohio St.3d 65, 2010-Ohio-2453, ¶ 11. If after one year the defendant does not respond to treatment and remains incompetent, the law authorizes two distinct paths forward. *Id.* at ¶ 12. The first path directs that the court or prosecutor may petition the probate court to commence civil commitment proceedings. *Id.*, citing R.C. 2945.39(A)(1). Second, as applicable to the instant matter, the court sua sponte or the prosecuting attorney may move to have the common pleas court retain jurisdiction over the defendant. *Id.*, citing R.C. 2945.39(A)(2). Specifically, as to the second approach:

> On the motion of the prosecutor or on its own motion, the court may retain jurisdiction over the defendant if, at a hearing, the court finds both of the following by clear and convincing evidence:
>
> (a) The defendant committed the offense with which the defendant is charged.
>
> (b) The defendant is a mentally ill person subject to court order or a person with an intellectual disability subject to institutionalization by court order.

R.C. 2945.39(A)(2).

{¶ 29} It is undisputed that the state moved the trial court to retain jurisdiction over appellant who was found incompetent to stand trial and unable to be restored to competency within the time limit provided in R.C. 2945.38(C).

{¶ 30} If a trial court determines the state has set forth clear and convincing evidence to satisfy the elements of R.C. 2945.39(A)(2)(a) and (b), "the court shall commit the defendant, if determined to require mental health treatment." R.C. 2945.39(D)(1). The defendant must be placed "in the least-restrictive commitment alternative available consistent with public safety and the defendant's welfare." *Williams* at ¶ 15, citing R.C. 2945.39(D)(1). In making its determination as to the least-restrictive commitment, "the

court shall consider the extent to which the [defendant] is a danger to [himself] and to others, the need for security, and the type of crime involved." R.C. 2945.39(D)(1). The statute provides that the court shall "give preference to protecting public safety." *Williams* at ¶ 15, citing R.C. 2945.39(D)(1).

### B. Standard of Review

{¶ 31} This court holds "the textbook standard of review for decisions finding a person mentally ill and subject to court-ordered hospitalization, is clear and convincing evidence." *Licking & Knox Community Mental Health & Recovery Bd. v. T.B.*, 10th Dist. No. 10AP-454, 2010-Ohio-3487, ¶ 5. Clear and convincing evidence is that degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the facts to be established. *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. It is more than a mere preponderance of the evidence, but does not require proof beyond a reasonable doubt. *Id.* "Where the proof required must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990).

{¶ 32} Appellant argues the trial court did not have sufficient evidence to support its findings by clear and convincing evidence. Although he uses the term "sufficient," appellant's arguments address credibility, inconsistency, contradiction, and weight—which are challenges to the manifest weight of the evidence. Furthermore, although this appeal arises from a criminal case, in *Williams* the Supreme Court of Ohio determined R.C. 2945.39 is a civil statute. *Williams* at ¶ 37. Accordingly, we apply a civil standard of review. In *In re K.W.*, 10th Dist. No. 06AP-731, 2006-Ohio-4908, ¶ 6, this court held we would not reverse a finding that a defendant is a mentally ill person subject to (court order) under R.C. 5122.01 as against the manifest weight of the evidence if it is " 'supported by some competent, credible evidence going to all the essential elements of the case.' " *Id.*, quoting *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978). In *State v. Decker*, 10th Dist. No. 16AP-684, 2017-Ohio-4266, ¶ 18 ("*Decker I*") (vacated upon reopening on other

grounds by *State v. Decker*, 10th Dist. No. 16AP-684, 2020-Ohio-1464 ("*Decker II*")),[4] this court held we would review the appeal "based on whether the trial court had evidence before it that was both sufficient and weighty enough to find the elements necessary for commitment by 'clear and convincing evidence.' " *Id.* at ¶ 18.[5]  In our review, we are mindful of both standards and will apply the same.

{¶ 33}  Furthermore, in our review we are mindful this matter was tried before the bench, and this court has held " 'a judge is presumed to consider only the relevant, material and competent evidence in arriving at a judgment, unless the contrary affirmatively appears from the record.' "  *State v. Powell*, 10th Dist. No. 14AP-1054, 2015-Ohio-4459, ¶ 20, quoting *State v. Johnson*, 5th Dist. No. 2014CA00189, 2015-Ohio-3113, ¶ 91, citing *State v. White*, 15 Ohio St.2d 146, 151 (1968).  *See also State v. Williams*, 6th Dist. No. L-11-1084, 2013-Ohio-726, ¶ 29-30, *appeal not allowed*, 135 Ohio St.3d 1461, 2013-Ohio-2285.

### C. The Trial Court Did Not Err by Retaining Jurisdiction Over Appellant

{¶ 34}  In support of his sole assignment of error, that the trial court erred when it found it retained jurisdiction over him, appellant raises two arguments.   Appellant contends the trial court erred when it found by clear and convincing evidence that: (1) appellant committed the offenses with which he was charged, and (2) appellant is a mentally ill person subject to court order.  We address appellant's arguments in turn.

---

[4] *See* appellate history of *State v. Decker*: *Decker I*, 2017-Ohio-4266 (original decision on appeal); *State v. Decker*, 10th Dist. No. 16AP-684 (Dec. 5, 2017) (memorandum decision) (granting reopening of appeal); *State v. Decker*, 151 Ohio St.3d 1509, *discretionary appeal not allowed*; *Decker II*, 2020-Ohio-1464 (vacating original decision upon reopening appeal).

[5] In *Decker I*, at ¶ 18, we stated:
> We never resolved the question set forth in *Licking & Knox*. But, upon our present revisit of the issue, we find that the Supreme Court has effectively resolved it by clarifying that *C.E. Morris* should not have been read to have created a distinct and more deferential manifest weight standard for civil cases and that sufficiency and weight are distinct concepts. *Eastley* [*v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179], at ¶ 8-23. Freed of the *C.E. Morris* standard, we rely instead on the language of the statute and the alternative proposed by *Licking & Knox*. We thus review Decker's appeal based on whether the trial court had evidence before it that was both sufficient and weighty enough to find the elements necessary for commitment by "clear and convincing evidence." R.C. 2945.39(A)(2); *Licking & Knox* at ¶ 5. Clear and convincing evidence is that degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the facts to be established. *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. It is more than a mere preponderance of the evidence but does not require proof beyond a reasonable doubt. *Id.*

### 1. Manifest Weight of the Evidence Supports the Trial Court's Finding that Appellant Committed the Offenses With Which He Was Charged

{¶ 35} Appellant first argues in support of his assignment of error the trial court erred when it found by clear and convincing evidence appellant committed the offenses with which he was charged asserting the testimony presented at trial was insufficient.

### May 13, 2017 Incident

{¶ 36} As to the May 13, 2017 incident, the trial court found by clear and convincing evidence appellant committed aggravated robbery and two counts of robbery. In support of his argument that the testimony presented at trial was insufficient, appellant contends none of the witnesses that testified as to the May 13, 2017 incident saw what happened.[6]

{¶ 37} As relevant here, aggravated robbery, as defined by R.C. 2911.01(A), provides: "No person, in attempting or committing a theft offense * * * or in fleeing immediately after the attempt or offense, shall * * * (3) [i]nflict, or attempt to inflict, serious physical harm on another." In determining whether appellant met the statutory criteria for aggravated robbery, we must also consider the definition of serious physical harm relevant to the facts herein, pursuant to R.C. 2901.01(A)(5), which means, in relevant part, any of the following:

> (b) Any physical harm that carries a substantial risk of death;
>
> (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
>
> (d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;
>
> (e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

Robbery, as defined by R.C. 2911.02 and in accord with the indictment filed against appellant, provides: "(A) [n]o person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall * * * (2) [i]nflict, attempt to inflict,

---

[6] During closing argument, the state acknowledged the testimony regarding the May 17, 2017 incident was stronger than the testimony provided as to the May 13, 2017 incident, however, the state argued the offenses for both incidents were proven by clear and convincing evidence.

or threaten to inflict physical harm on another; (3) [u]se or threaten the immediate use of force against another."

{¶ 38} The testimony reflects Adi was led to believe he was arranging to purchase an iPhone by way of contact through OfferUp, however, the intention was not to sell the iPhone but to rob Adi. Murphy, appellant, and James drove to Adi's apartment complex together. Appellant and James waited for Adi to meet alone with Murphy. While Adi was in Murphy's car, appellant and James approached, opening Murphy's passenger side car door. Adi was pulled from the car, assaulted, then assaulted again after he unsuccessfully tried to run from appellant and James across the parking lot. Based on movements Murphy felt while in her car, she believed a physical altercation took place. Adi's property was removed from his pockets and appellant and James re-entered Murphy's car and with them they had an iPhone and wallet they did not have when they arrived. Adi was left briefly unconscious in the parking lot.

{¶ 39} Detective Kirby testified to information gathered during the course of his investigation that reflected the events of the incident as testified to by Murphy. Detective Kirby testified to personally observing injury to Adi during his meeting with him and receiving photographs from Adi taken after the incident depicting injury to Adi's face, nose, lips, and mouth. The photographs provided to Detective Kirby reflect Adi was treated at a hospital for his injuries and that he suffered abrasions to the inside of his upper lip and a cut requiring stitches to the left side of his nose.

{¶ 40} In arguing that the witnesses who testified did not personally observe the May 13, 2017 incident, appellant specifically contends: (1) Murphy turned her back once appellant and James encountered Adi, (2) Adi did not testify, and (3) Adi identified someone other than appellant in the line-up.

{¶ 41} Detective Kirby testified Adi indicated three black males assaulted and robbed him and also provided Detective Kirby with identifying information that led him to Murphy. Specifically, Adi had information from the OfferUp app he used to contact Murphy in addition to Murphy's cell phone number. According to Detective Kirby, Adi had researched on his own and found Murphy's Facebook page and provided a photograph of her. From this information provided by Adi, Detective Kirby was able to identify Murphy. There is no indication that Adi and Murphy knew one another other than this encounter.

Both Murphy and Adi identified the use of a specific app, OfferUp, with which the crime was facilitated.

{¶ 42} Murphy's testimony identified appellant as one of the individuals who participated in the incident and also established she felt movement in her car while appellant and James were involved with Adi, in addition to appellant and James returning to her car with property they did not possess before she dropped them off in front of Adi's apartment complex. The trial judge was aware that Murphy did not visually observe Adi being robbed or physically harmed. The trial judge was also aware that Adi did not testify and further did not identify appellant as one of his assailants.

{¶ 43} Thus, we are not persuaded by appellant's arguments.

{¶ 44} Accordingly, we find the trial court's finding by clear and convincing evidence that appellant committed the offenses related to the May 13, 2017 incident was not against the manifest weight of the evidence.

### May 17, 2017 Incident

{¶ 45} As to the May 17, 2017 incident, the trial court found by clear and convincing evidence that appellant committed aggravated burglary, aggravated robbery, two counts of robbery, and kidnapping. The indictment included firearm specifications associated with the charges related to the May 17, 2017 offense. The state acknowledged during closing arguments that evidence was not presented to support the firearm specifications included in the indictment and requested the court dismiss the charges. Aggravated burglary, as defined by R.C. 2911.11, provides:

> (A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:
>
> (1) The offender inflicts, or attempts or threatens to inflict physical harm on another;
>
> (2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

Kidnapping, as defined by R.C. 2905.01, provides:

> (A) No person, by force, threat, or deception, or, * * * by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
>
> * * *
>
> (2) To facilitate the commission of any felony or flight thereafter[.]

{¶ 46} The testimony presented at trial reflects Small invited Murphy to his apartment after communicating with her on the Plenty of Fish app. Murphy testified she drove James and appellant to Small's apartment, while Tanksley drove Taylor separately to meet James in the apartment complex parking lot. Murphy was instructed to go into Small's apartment and wait for a knock at the door. Both Murphy and Tanksley testified appellant was present with the group that entered Small's apartment, without Small's invitation or consent. Appellant and James had a golf club, and Small was then struck with the golf club and held against a wall rendering him unable to free himself. While Small was beaten and held, his personal belongings and cash were stolen by the group. Both Small and Tanksley testified the group was present in Small's apartment for approximately three minutes. Small testified he suffered physical injuries as a result of the robbery in his apartment and since the robbery he suffers from paranoia and fear.

{¶ 47} In support of his argument that the testimony presented at trial was insufficient, appellant asserts the following arguments regarding the testimony presented related to the May 17, 2017 incident: (1) Tanksley testified Murphy was lying, (2) Murphy ran out of Small's apartment upon the group entering, and (3) Small testified but was unable to identify appellant in a photo array.

{¶ 48} In addressing appellant's first argument, review of the record reflects Tanksley testified Taylor carried Small's T.V. out of the apartment and testified Murphy lied when she testified it was Tanksley who had the T.V. The question appellant raises is one of credibility. We have noted in the criminal context, and find to be equally applicable here, that determinations of credibility and weight of the testimony are primarily for the trier of fact. *State v. Hart*, 10th Dist. No. 17AP-659, 2018-Ohio-2907, ¶ 19. "[W]hile the

[factfinder] may take note of the inconsistencies and resolve or discount them accordingly, * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." (Quotations and citations omitted.) *State v. Stewart*, 10th Dist. No. 10AP-526, 2011-Ohio-466, ¶ 20. Thus, we are not persuaded by appellant's arguments.

{¶ 49} In addressing appellant's second and third arguments, we note that although Murphy left Small's apartment prior to the group entering, her testimony provides sufficient facts to establish the events prior to and after the offense in Small's apartment. Further, although Small did not identify appellant as one of his assailants, he did identify Murphy and Tanksley. Small identified Murphy to Detective Kirby by her cell phone number and also a Facebook picture. Small identified Tanksley's license plate number and also provided testimony similar to Murphy—that the group drove to Small's apartment in two vehicles, both of which were identified by Small in his testimony. It was through Small's identification of Tanksley's license plate number that Tanksley was identified as being part of the May 17, 2017 incident. As with the May 13, 2017 incident, the trial judge was aware that Murphy did not observe visually the incident that occurred in Small's apartment and further that Small did not identify appellant as one of his assailants. Thus, we are not persuaded by appellant's arguments.

{¶ 50} Accordingly, we find the trial court's finding by clear and convincing evidence that appellant committed the offenses related to the May 17, 2017 incident was not against the manifest weight of the evidence.

{¶ 51} In addition to arguing the trial court erred in finding appellant committed the charged offenses by clear and convincing evidence, appellant argues the trial court was required to provide a limiting instruction to the jury pursuant to R.C. 2923.03(D), which provides:

> If an alleged accomplice of the defendant testifies against the defendant in a case in which the defendant is charged with complicity in the commission of or an attempt to commit an offense, an attempt to commit an offense, or an offense, the court, *when it charges the jury*, shall state substantially the following:
>
> "The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude, or

> self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion, and require that it be weighed with great caution.
>
> It is for you, as jurors, in the light of all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth."

(Emphasis added.)   Appellant's hearing was tried before the bench and did not involve a jury; therefore, we do not find the limiting instruction was required.  *See* R.C. 2923.03(D); *In re Watson*, 47 Ohio St.3d 86, 91 (1989) (observing "this case was tried before the trial judge; therefore, the risk that the jury would not follow the court's instructions was not present. Furthermore, we have noted that the trial court can be presumed to apply the law correctly, and there is no reason to believe otherwise in this case").

### 2. Manifest Weight of the Evidence Supports Trial Court Finding that Appellant is a Mentally Ill Person Subject to Court Order

{¶ 52}  Appellant also argues in support of his assignment of error that the trial court erred when it found by clear and convincing evidence that he is a mentally ill person subject to court order.

{¶ 53}  As relevant here, in order to retain jurisdiction over appellant, in addition to finding appellant committed the offenses with which he was charged, the trial court must also find by clear and convincing evidence that appellant is "a mentally ill person subject to court order." R.C. 2945.39(A)(2)(a) and (b).[7]  As provided in R.C. 2945.37(A)(7), applicable to R.C. 2945.39, " 'mentally ill person subject to court order' [has] the same meaning as in section 5122.01 of the Revised Code."  R.C. 5122.01(B) states, in relevant part:

> "Mentally ill person subject to court order" means a mentally ill person who, because of the person's illness:
>
> (1) Represents a substantial risk of physical harm to self as manifested by evidence of threats of, or attempts at, suicide or serious self-inflicted bodily harm;

---

[7] R.C. 2945.39(A)(2)(b) includes in the alternative a person with an intellectual disability subject to institutionalization by court order, however, here the trial court did not find appellant had an intellectual disability subject to institutionalization by court order and therefore the alternative finding will not be explored.

(2) Represents a substantial risk of physical harm to others as manifested by evidence of recent homicidal or other violent behavior, evidence of recent threats that place another in reasonable fear of violent behavior and serious physical harm, or other evidence of present dangerousness;

(3) Represents a substantial and immediate risk of serious physical impairment or injury to self as manifested by evidence that the person is unable to provide for and is not providing for the person's basic physical needs because of the person's mental illness and that appropriate provision for those needs cannot be made immediately available in the community;

(4) Would benefit from treatment for the person's mental illness and is in need of such treatment as manifested by evidence of behavior that creates a grave and imminent risk to substantial rights of others or the person[.]

* * *

Pursuant to R.C. 5122.01(A), " '[m]ental illness' means a substantial disorder of thought, mood, perception, orientation, or memory that grossly impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life."

{¶ 54} In finding clear and convincing evidence appellant suffers from a mental illness as defined by R.C. 5122.01(A), the trial court cited Dr. Rasmussen's October 30, 2019 report wherein the doctor stated appellant "suffers from a 'substantial disorder of thought, mood, perception, orientation, or memory that grossly impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life.' " (Mar. 5, 2020 Entry at 13.) Based on the testimony of Dr. Rasmussen and the reports submitted to the court, the trial court found factors (1), (3), and (4) of R.C. 5122.01(B) were present. The trial court concluded appellant suffers from a mental illness and is a mentally ill person subject to court order.

{¶ 55} Appellant raises two arguments in support of his contention that the court lacked clear and convincing evidence to find him a mentally ill person subject to court order.[8] First, appellant argues the trial court relied on authority found in *K.W.* and *Decker*

---

[8] We note appellant does not raise argument related to the trial court's finding him mentally ill pursuant to R.C. 5122.01(A), therefore we will not address the trial court's consideration and findings thereunder.

*I* in error to support its finding the categories enumerated in R.C. 5122.01(B) are not cumulative, thereby requiring only one category be met in order to find appellant is a mentally ill person subject to court order. Second, appellant argues the testimony presented by Dr. Rasmussen was insufficient to support a finding that even one of the R.C. 5122.01(B) categories was met.

### a. *Application of R.C. 5122.01(B) Criteria in the Disjunctive*

{¶ 56} Appellant argues the trial court's application of R.C. 5122.01(B) in the disjunctive was in error because *K.W.* involved a probate court's involuntary commitment decision and *Decker I* was vacated upon reopening the appeal,[9] and also relied on a case[10] which involved a probate court's involuntary commitment decision. Appellant suggests a probate court's determination whether a person is mentally ill and subject to court order in the context of determining whether to authorize involuntary commitment or medication is different from the determination the trial court here made regarding whether appellant is mentally ill and subject to court order in the context of determining whether it may retain jurisdiction over a defendant in a criminal case.

{¶ 57} We are not persuaded. A probate court's determination regarding involuntary commitment or medication of a mentally ill person is governed by R.C. Chapter 5122. "As used in this chapter [R.C. 5122]," "[m]ental illness" is defined at R.C. 5122.01(A), and "[m]entally ill person subject to court order" is defined at R.C. 5122.01(B). The trial court's determination here regarding retaining jurisdiction over appellant in a criminal case is governed by R.C. 2945.39. "As used in sections 2945.37 to 2945.402 of the Revised Code," "mentally ill person subject to court order" "[has] the same meaning as in section 5122.01 of the Revised Code." R.C. 2945.37(A)(7).

---

[9] This court explained in *Decker II*, at ¶ 1:

> Defendant-appellant, Louis Decker, previously appealed a September 21, 2016 entry of the Franklin County Court of Common Pleas committing him to the Columbus Developmental Center pursuant to R.C. 2945.39(D)(1) and 5122.01(B)(2). *State v. Decker*, 10th Dist. No. 16AP-684, 2017-Ohio-4266 ("*Decker I*"). We affirmed the commitment decision. *Id.* However, in a memorandum decision issued on December 5, 2017, we granted an application for reopening of the appeal pursuant to App.R. 26(B). *State v. Decker*, 10th Dist. No. 16AP-684, ¶ 14-25 (Dec. 5, 2017) (memorandum decision) ("*Decker II*"). Because we find that trial counsel was ineffective in failing to adequately contest the question of Decker's guilt and because appellate counsel was likewise ineffective in failing to raise that issue on appeal, we vacate our prior decision and reverse.

[10] *In re Mental Illness of Boggs*, 50 Ohio St.3d 217 (1990).

{¶ 58} We do not agree with appellant that the precedent applying R.C. 5122.01(B) in the disjunctive in the context of a probate court determining involuntary commitment or medication should not also be applied in the context of determining retaining jurisdiction pursuant to R.C. 2945.39 in the context of a criminal case as the definition in R.C. 5122.01(B) is used, as directed by statute, in both contexts. *See In re Mental Illness of Boggs*, 50 Ohio St.3d 217, 219 (1990) (stating "pursuant to R.C. 5122.11, proceedings for judicial hospitalization commence upon the filing of an affidavit which must contain a specific allegation setting forth at least one category listed in R.C. 5122.01(B)") (Emphasis omitted.); *Decker I* at ¶ 20 (stating "[a]lthough the statutory language does not indicate whether this list is conjunctive or disjunctive, the Supreme Court has stated that the definition may be satisfied if at least one of the categories is met"); *In re T.B.*, 10th Dist. No. 11AP-99, 2011-Ohio-1339, ¶ 18 (even if the probate court lacked clear and convincing evidence to satisfy R.C. 5122.01(B)(2), the probate court shall be affirmed because "clear and convincing evidence supports a finding under R.C. 5122.01(B)(4)"); *In re A.C.*, 10th Dist. No. 20AP-82, 2021-Ohio-2116, ¶ 39 (evidence supported the finding that the appellant was a mentally ill person subject to court order pursuant to R.C. 5122.01(B)(4) and therefore the court must affirm even if evidence did not support the finding that the appellant was a mentally ill person subject to court order pursuant to R.C. 5122.01(B)(3)). Furthermore, appellant points us to no authority that would support the categories of R.C. 5122.01(B) must be met in the conjunctive, rather than the disjunctive, to find a person is a "[m]entally ill person subject to court order." Therefore, we find the trial court did not err in its application of R.C. 5122.01(B) in the disjunctive rather than the conjunctive.

### b. *Manifest Weight of Dr. Rasmussen's Testimony and Report*

{¶ 59} In addition to questioning the trial court's application of R.C. 5122.01(B), appellant also asserts the testimony of Dr. Rasmussen was insufficient to support the trial court's finding by clear and convincing evidence that appellant is a mentally ill person subject to court order pursuant to R.C. 5122.01(B)(1), (3), and (4). Appellant contends that "based upon inconsistencies in the doctor's statements versus conclusions reached by her staff, there was not clear and convincing evidence that even one of the four factors was present." (Appellant's Brief at 12.)

{¶ 60} We begin by noting that before the trial court appellant conceded that R.C. 5122.01(B)(4) was met.[11] This concession alone suffices to support the trial court's finding pursuant to R.C. 2945.39(A)(2)(b) and 5122.01(B). Nevertheless, we will examine appellant's arguments and look to Dr. Rasmussen's testimony during the January 21, 2020 hearing regarding her evaluations of appellant and her reports dated May 30 and October 30, 2019.

{¶ 61} Dr. Rasmussen conducted her first evaluation of appellant on May 21, 2019 on a request for an intellectual disability evaluation as a result of an evaluation performed by Dr. Martines dated April 18, 2019. In addition to finding appellant incompetent to stand trial, Dr. Rasmussen's May 30, 2019 report found appellant had cognitive deficits that fall within the borderline to mild range; but was unable to clearly identify the exact level of deficit due to inconsistencies between what was reported of appellant's abilities by his father and Dr. Rasmussen's observations of appellant at the time. As a result, Dr. Rasmussen recommended continued evaluation and treatment in a facility operated by ODDD, which was the least restrictive treatment alternative consistent with appellant's needs. Thereafter, appellant was committed to CDC pursuant to the trial court's June 18, 2019 entry.

{¶ 62} Dr. Rasmussen conducted a second evaluation of appellant on October 29, 2019, reflected in a report dated October 30, 2019. Dr. Rasmussen testified that on admission to CDC appellant was evaluated by the CDC psychiatrist and given a diagnosis of Schizoaffective Disorder for which he was prescribed medications. Dr. Rasmussen reported appellant is compliant with taking his medications and exhibiting a decrease in symptoms. Dr. Rasmussen testified appellant's adaptive behavior score, completed by staff working in appellant's unit, reflected the same level as reported by appellant's father in May 2019. However, overall, despite having a course of treatment, Dr. Rasmussen testified appellant showed little progress with regard to competency and restoration. Dr. Rasmussen further testified there was not a substantial probability appellant would become competent if given further treatment.

---

[11] Appellant's lawyer stated: "As far as number (4), I don't think I can really disagree with benefitting from treatment. Clearly, he is benefitting from treatment. I think the doctor testified that he has been doing well and he has been compliant with his medication, so I don't think there is any evidence to say that number (4) is not present." (Tr. at 204.)

{¶ 63} In her October 30, 2019 report, Dr. Rasmussen found appellant to be mentally ill, taking into consideration the definition as provided by R.C. 5122.01(A). In her testimony, Dr. Rasmussen listed the following factors as considerations supporting her diagnosis: impairment in judgment, self-harm behavior exhibited by banging his head on the wall or hitting himself in the head, some hallucinations, and support needed in order to meet the demands of ordinary life. Dr. Rasmussen further testified to appellant being a vulnerable individual who is easily influenced by other people; more specifically, appellant is unable to think through his actions and potential consequences.

{¶ 64} Dr. Rasmussen testified appellant was already determined unable to manage his own affairs because a payee was established for appellant prior to his arrival at CDC. According to Dr. Rasmussen, appellant's payee manages his funds and bills due to his inability to understand money. Dr. Rasmussen does not believe appellant could live on his own safely and independently and, in order for appellant to do so, he would need services providing structure, support, and supervision in order for him to live in the community, none of which are currently in place for appellant. She noted concerns for appellant's safety, and identified a hot stove as a risk.

{¶ 65} Further, Dr. Rasmussen testified appellant lacks insight into his condition that would be necessary to ensure appellant will continue with treatment as prescribed or seek professional medical help. Dr. Rasmussen believes commitment to ODDD, such as CDC, would be the least restrictive setting after taking into consideration appellant's level of dangerousness to himself and others, and appellant's treatment needs regarding daily living skills, money management, and mental illness.

{¶ 66} In support of his argument that insufficient evidence was presented to support finding appellant a mentally ill person subject to court order pursuant to R.C. 5122.01(B), appellant contends Dr. Rasmussen's opinion was contradicted both by the record and on cross-examination. We will address appellant's arguments in turn.

{¶ 67} Appellant first argues against Dr. Rasmussen's opinion regarding R.C. 5122.01(B)(1), that he represents a substantial risk of physical harm to himself.[12] Appellant points specifically to Dr. Rasmussen's responses on cross-examination where appellant

---

[12] Under R.C. 5122.01(B), " 'Mentally ill person subject to court order' means a mentally ill person who, because of the person's illness: (1) Represents a substantial risk of physical harm to self as manifested by evidence of threats of, or attempts at, suicide or serious self-inflicted bodily harm."

argues Dr. Rasmussen conceded his self-harm was merely him banging his head when frustrated.

{¶ 68} Dr. Rasmussen testified appellant engages in self-harm by hitting himself in the head or banging his head against the wall or similar acts, generally as a result of frustration; however, on cross-examination Dr. Rasmussen acknowledged appellant's head banging was not reported during his evaluation with her. Dr. Rasmussen testified appellant's self-harm behavior was reported by Dr. Martines in her report which was reviewed by Dr. Rasmussen for purposes of gathering background information. Dr. Rasmussen testified according to Dr. Martines' report, "[appellant] reported frequent thoughts of self-harm and recent attempts to punch himself or hit his head on walls; and that due to those concerns, at the conclusion of the interview, Dr. Martines personally met with the Correctional Mental Health Coordinator and conveyed her concerns." (Tr. at 176.) Dr. Rasmussen testified appellant's self-harm behaviors were observed at CDC and have improved. Dr. Rasmussen opined the self-harm behaviors exhibited by appellant could be serious in that brain damage could result from head banging. Dr. Rasmussen also testified that in addition to engaging in self-harm behaviors, appellant exhibits poor judgment leading him to situations where he could be a danger to himself.

{¶ 69} We are not persuaded by appellant's argument. Accordingly, we find the trial court's finding by clear and convincing evidence that appellant was a mentally ill person subject to court order pursuant to R.C. 5122.01(B)(1) was not against the manifest weight of the evidence.

{¶ 70} Appellant next argues against Dr. Rasmussen's opinion regarding R.C. 5122.01(B)(3), that appellant represented a risk of serious physical injury to himself due to his inability to provide for his basic needs.[13] Appellant contends Dr. Rasmussen's opinion was contradicted by CDC staff who interacted with appellant on a daily basis and observed his ability to perform a wide variety of tasks.

---

[13] Under R.C. 5122.01(B), " 'Mentally ill person subject to court order' means a mentally ill person who, because of the person's illness: * * * (3) Represents a substantial and immediate risk of serious physical impairment or injury to self as manifested by evidence that the person is unable to provide for and is not providing for the person's basic physical needs because of the person's mental illness and that appropriate provision for those needs cannot be made immediately available in the community."

{¶ 71} An adaptive behavior assessment of appellant is reflected in both Dr. Rasmussen's reports. The adaptive behavior assessment is made up of three domains; conceptual, social, and practical. Appellant's father provided responses to complete the assessment for the May 30, 2019 report, and CDC staff working with appellant on a daily basis completed the assessment for the October 30, 2019 report.

{¶ 72} With regard to the social domain, on cross-examination, counsel questioned Dr. Rasmussen regarding appellant's ability to perform a number of tasks as indicated in her May 30, 2019 report. Specifically, the report indicates appellant is able to reserve tickets in advance and make travel arrangements. Dr. Rasmussen responded that although the CDC staff reported appellant was able to perform a number of tasks, she clarified that staff did not have the opportunity to observe appellant performing the identified tasks such as purchasing tickets in advance or making travel arrangements. Dr. Rasmussen testified, "[m]y report states that per that assessment that staff identified him as being able to do those things. * * * With the caveat that we have no experience with him being able to do that." (Tr. at 168.)[14] We note specific tasks regarding the social domain were not delineated in the October 30, 2019 report in which CDC staff completed the responses, rather the line of questioning on cross-examination referred to the responses given by appellant's father who provided responses to those specific tasks. Notwithstanding the confusion during cross-examination of Dr. Rasmussen during this particular juncture of the trial, appellant's social domain was his highest score on the adaptive behavior assessment, scoring high or higher than 21 percent of people his age in the May 30, 2019 report and high or higher than 23 percent of people his age in the October 30, 2019 report.

{¶ 73} With regard to the practical domain, summarizing appellant's performance across community use, home living, health and safety, self-care, and work skill areas, appellant's lowest score was in the area of health and safety and highest in self-care; ranking him in the below average range at high or higher than 9 percent of people his age according to both of Dr. Rasmussen's reports. Dr. Rasmussen explained that means only 9 percent of people function at the same or a lower level than that scored by appellant.

---

[14] We note that Dr. Rasmussen's October 30, 2019 report states CDC staff performed the evaluation, however the caveat as testified to by Dr. Rasmussen was not explicitly stated in the report nor was a note made that some tasks are not observable in the CDC.

{¶ 74} With regard to the conceptual domain, summarizing appellant's performance across communication, functional academics, and self-direction skill areas, appellant's conceptual domain score was in the low range, high or higher than 7 percent of people his age in both Dr. Rasmussen's reports. The tasks identified by counsel on cross-examination such as appellant's ability to state his telephone number, answer the phone, complete written forms to apply for jobs, write and send e-mails, were detailed in the May 30, 2019 report. Dr. Rasmussen testified that those persons unable to perform the tasks detailed on the record would suffer from either profound intellectual disability or a physical limitation.

{¶ 75} Dr. Rasmussen's October 30, 2019 report regarding the results of appellant's adaptive behavior assessment reflect appellant's lowest score was in health and safety and his highest score was in the area of self-care; overall the results of the testing reflected in the October 30, 2019 report are consistent with the results in the May 30, 2019 report when appellant's father provided responses. However, appellant's adaptive behavior assessment results were not the only indicators on which Dr. Rasmussen relied to form her opinion as to whether category R.C. 5122.01(B)(3) was present.

{¶ 76} Specifically addressing the reasons that support her opinion that appellant is a mentally ill person subject to court order pursuant to R.C. 5122.01(B)(3), Dr. Rasmussen testified that at the time of the May 2017 incidents, appellant was not receiving mental health services. Dr. Rasmussen continued that mental health services are not established for appellant in the community and obtaining those services are not a simple task. Dr. Rasmussen believes appellant would potentially need some services in place 24/7 in order to provide the needed supervision and support.

{¶ 77} We are not persuaded by appellant's argument that Dr. Rasmussen's opinion was contradicted regarding appellant's risk of serious injury to himself due to his inability to provide for his basic needs. Accordingly, we find the trial court's finding by clear and convincing evidence that appellant was a mentally ill person subject to court order pursuant to R.C. 5122.01(B)(3) was not against the manifest weight of the evidence.

{¶ 78} Appellant's third argument addresses Dr. Rasmussen's opinion regarding R.C. 5122.01(B)(4), that appellant could benefit from treatment for mental illness.[15]  We have already observed that before the trial court appellant conceded that R.C. 5122.01(B)(4) had been established.  Notwithstanding, before this court, appellant argues there is a lack of history on which Dr. Rasmussen could opine appellant would not take his medications. During her testimony, Dr. Rasmussen acknowledged it was difficult for her to answer whether appellant would continue treatment should he be released from commitment.  Dr. Rasmussen affirmed appellant is compliant in taking his medications at CDC; however, she also noted a nurse delivers his daily medications.  Without past history to establish conformity, Dr. Rasmussen could not affirmatively answer how compliant appellant would be with his medication. Dr. Rasmussen testified appellant's mental illness and the concerns held regarding appellant by Dr. Rasmussen would not be resolved even if appellant was compliant taking his medications.  Dr. Rasmussen explained appellant's medications were prescribed to address his symptoms of hallucinations and for mood stabilization.  However, according to Dr. Rasmussen, appellant's issues with judgment, perception, and impulsivity would still be present.

{¶ 79} In specifically addressing the reasons that support her opinion that appellant is a mentally ill person subject to court order pursuant to R.C. 5122.01(B)(4), Dr. Rasmussen testified that without services in place for appellant in the community or supervision, appellant could find himself in a situation similar to the May 2017 incidents, by way of associating with individuals who are not a good influence coupled with his lack of judgment. Dr. Rasmussen testified in her opinion that the crimes committed by appellant were near the highest level of seriousness having potential to create danger or harm to others, which appellant remains at risk for becoming involved in again.

{¶ 80} We are not persuaded by appellant's argument that his lack of history to support questionable compliance with his medications defeats Dr. Rasmussen's testimony that he could benefit from treatment for his mental illness.  Accordingly, we find the trial court's finding by clear and convincing evidence that appellant was a mentally ill person

[15] Under R.C. 5122.01(B), " 'Mentally ill person subject to court order' means a mentally ill person who, because of the person's illness: * * * (4) Would benefit from treatment for the person's mental illness and is in need of such treatment as manifested by evidence of behavior that creates a grave and imminent risk to substantial rights of others or the person."

subject to court order pursuant to R.C. 5122.01(B)(4) was not against the manifest weight of the evidence.

{¶ 81} Furthermore, on review of Dr. Rasmussen's testimony and reports, in addition to the specific arguments asserted by appellant as addressed above, we do not find Dr. Rasmussen's opinion was contradicted.

{¶ 82} Finally, the Supreme Court instructed courts to exercise broad discretion under R.C. 5122.01(B), pursuant to a totality of the circumstances test. *In re Burton*, 11 Ohio St.3d 147, 149-50 (1984). Specifically, the Supreme Court provided:

> In order to guide the court's discretion in this regard, we hereby adopt a "totality of the circumstances" test to be utilized in determining whether a person is subject to hospitalization under R.C. 5122.01(B). This test balances the individual's right against involuntary confinement in deprivation of his liberty, and the state's interest in committing the emotionally disturbed. *See Addington v. Texas* (1979), 441 U.S. 418. Factors which are to be considered by the court in a commitment hearing include, but are not limited to, the following: (1) whether, in the court's view, the individual currently represents a substantial risk of physical harm to himself or other members of society; (2) psychiatric and medical testimony as to the present mental and physical condition of the alleged incompetent; (3) whether the person has insight into his condition so that he will continue treatment as prescribed or seek professional assistance if needed; (4) the grounds upon which the state relies for the proposed commitment; (5) any past history which is relevant to establish the individual's degree of conformity to the laws, rules, regulations and values of society; and (6) if there is evidence that the person's mental illness is in a state of remission, the court must also consider the medically suggested cause and degree of the remission and the probability that the individual will continue treatment to maintain the remissive state of his illness should he be released from commitment.
>
> The trial court is not limited to consider only the above factors. The court may, in its discretion, consider other relevant evidence to make an informed decision as to the person's present mental condition.

*Burton* at 149-50.

{¶ 83} Considering the totality of the circumstances, Dr. Rasmussen found appellant to be a vulnerable individual in his ability to exercise good judgment or make decisions on his own. By way of example, Dr. Rasmussen testified to a time when appellant was asked what he would do if another prisoner told him to change his story; appellant responded he would change his story. Dr. Rasmussen further opined appellant is easily led and lacks the ability to sort through actions and potential consequences.

{¶ 84} As to the incidents that occurred in May 2017 that led to appellant's criminal indictment, Dr. Rasmussen believes appellant "found himself in a situation where he was asked to do things and was kind of led down the path that I don't think he would have done on his own." (Tr. at 150.) Considering the level of seriousness of the crimes with which appellant was charged, Dr. Rasmussen testified she rated the charges faced by appellant as an eight out of ten, ten being the highest level of seriousness. Dr. Rasmussen also testified the charges faced by appellant have potential to create danger or harm to others. Dr. Rasmussen opined that without supervision, appellant remains at risk for becoming involved in incidents similar to those for which he is charged.

{¶ 85} Dr. Rasmussen further testified appellant does not have insight into his condition to ensure he will continue treatment as prescribed or seek professional assistance if needed. At the time of Dr. Rasmussen's testimony, appellant's mental illness was not in a state of remission. In addition to mental health services not being established for appellant, Dr. Rasmussen testified he does not have the capacity or capability to establish those services himself. Dr. Rasmussen stated appellant needs supervision for safe functioning in the community and would not function independently. Dr. Rasmussen pointed to the fact that appellant has a payee and has already been determined unable to manage his own affairs. Further, in forming her opinion, Dr. Rasmussen testified she considered the extent appellant may be a danger to himself and others.

{¶ 86} Thus, taking into consideration the foregoing analysis, we find the trial court's finding by clear and convincing evidence that appellant was a mentally ill person subject to court order pursuant to R.C. 5122.01(B)(1), (3), and (4) was not against the manifest weight of the evidence.

{¶ 87} Accordingly, we overrule appellant's sole assignment of error.

## IV. Conclusion

{¶ 88}   Having overruled appellant's sole assignment of error, the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

BROWN and KLATT, JJ., concur.

————————————